# EXHIBIT 1

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

# MF Global Holdings Ltd.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

    (2)    Aggregate number of securities to which transaction applies:

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)    Proposed maximum aggregate value of transaction:

    (5)    Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:

    (2)    Form, Schedule or Registration Statement No.:

    (3)    Filing Party:

    (4)    Date Filed:

Table of Contents



**MF Global Holdings Ltd.**
**717 Fifth Avenue, 9th Floor**
**New York, New York 10022**

July 7, 2011

Dear MF Global Shareholder:

You are cordially invited to attend our 2011 Annual Shareholders' Meeting. We will hold the meeting on Thursday, August 11, 2011 at 10:00 a.m., Eastern Daylight Time, at Omni Berkshire Place, 21 East 52nd Street, New York, New York 10022. We hope you will be able to attend.

Enclosed you will find a notice setting forth the business expected to come before the meeting, the Proxy Statement, a proxy card and a copy of our 2011 Annual Report on Form 10-K.

Your vote is very important to us. Whether or not you plan to attend the meeting in person, your shares should be represented and voted.

We encourage you to submit your proxy via the Internet using the control number that appears on the front of your proxy card and to choose to view future mailings electronically rather than receiving them by mail.

Sincerely,

Jon S. Corzine
*Chairman and Chief Executive Officer*

Table of Contents

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

# CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

## Review, Approval or Ratification of Transactions with Related Persons

Our Board of Directors maintains a Related-Party Transactions Policy providing that the Nominating and Corporate Governance Committee reviews and approves transactions in excess of $120,000 of value in which we participate and in which any "Related Party" has or will have a direct or indirect material interest. "Related Party" is defined as a director or director nominee, an executive officer, a person known by the Company to be the beneficial owner of more than 5% of any class of the Company's voting securities or a person known by the Company to be an immediate family member of any of the foregoing. Under this policy, the Nominating and Corporate Governance Committee is to obtain all information it believes to be relevant to a review and approval of these transactions. After consideration of the relevant information, the Nominating and Corporate Governance Committee is to approve only those related-party transactions that they determine are not inconsistent with the best interests of the Company. In determining whether to approve a Related-Party transaction, the Nominating and Corporate Governance Committee will consider, among other factors, the following factors to the extent relevant to the Related-Party transaction:

•  whether the terms of the Related-Party transaction are fair to the Company and on the same basis as would apply if the transaction did not involve a Related Party;

•  whether there are business reasons for the Company to enter into the Related-Party transaction;

•  whether the Related-Party transaction would impair the independence of a non-management director; and

•  whether the Related-Party transaction would present an improper conflict of interest for any director or executive officer of the Company, taking into account the size of the transaction, the overall financial position of the director, executive officer or Related Party, the direct or indirect nature of the director's, executive officer's or Related Party's interest in the transaction and the ongoing nature of any proposed relationship and any other factors the Committee deems relevant.

Notwithstanding the foregoing, the following shall not be Related-Party transactions:

•  Any transaction or relationship involving a director or a director's immediate family member that is (1) of a kind specifically deemed not to preclude independence under the NYSE director independence standards then in effect or (2) deemed to be immaterial under any director independence standards of the Company which may then be in effect.

•  Indemnification payments made pursuant to the Company's by-laws or pursuant to any agreement or instrument.

•  Any transaction that involves the providing of compensation to a director or executive officer for their services in that capacity.

All Related-Party transactions must be approved or ratified by the Nominating and Corporate Governance Committee or the Board of Directors in accordance with our policy. A Related-Party transaction entered into without pre-approval of the Nominating and Corporate Governance Committee or the Board of Directors shall not be deemed to violate this policy, or be invalid or unenforceable, as long as the transaction is brought to either body within a reasonable period of time after it is entered into or comes to the attention of the appropriate personnel.

## Relationship with J.C. Flowers

We signed a definitive agreement, dated as of May 20, 2008 and as amended on June 10, 2008, which we refer to as the "investment agreement", with J.C. Fund II, an affiliate of J.C. Flowers, pursuant to which J.C. Flowers agreed to provide a commitment of up to $300.0 million toward the sale of equity or equity-linked securities. Under the terms of the investment agreement, on July 18, 2008, J.C. Flowers purchased $150.0 million in aggregate liquidation preference of a new series of equity securities in the form of convertible preferred shares, which we have designated the Series A Shares. The proceeds from the investment agreement were used to repay a portion of a bridge facility that was to mature on December 12, 2008.

Subject to certain exceptions, none of the Series A Shares sold to J.C. Flowers were permitted to be transferred for a period of 12 months after closing, and J.C. Flowers may not beneficially own 20% or more of our outstanding Common Stock for a period of three years after the closing, which was July 18, 2008. Immediately prior to signing the definitive agreement with J.C. Flowers, we also amended our shareholder rights plan to exclude J.C. Flowers (including any affiliate of J.C. Flowers), after the first time it becomes the beneficial owner of 15% or more of our Common Stock, and until such time as either it falls below the threshold or becomes the owner of 20% or more of our Common Stock, from the provision that triggers the rights plan when any person acquires 15% or more of our issued and outstanding Common Stock without approval of our Board.

Each Series A Share is convertible at any time at the option of the holder into our Common Stock at the rate of eight shares of Common Stock per Series A Share, representing an initial conversion price of $12.50 per share of Common Stock. The conversion rate and the conversion price are subject to adjustments in certain circumstances. Dividends on the Series A Shares are cumulative at the rate of 10.725% per annum, payable in cash or Common Stock, at our option, and holders will participate in Common Stock dividends, if any. Dividends are payable if, as and when determined by the Board of Directors, but, if not paid, they accumulate and dividends accrue on the arrearage at the same annual rate. Accumulated dividends on the Series A Shares become payable in full upon any conversion or any liquidation of us. We will not be permitted to pay any dividends on or to repurchase our Common Stock during any period when dividends on the Series A Shares are in arrears. Holders will have the right to vote with holders of the Common Stock on an "as-converted" basis. We may require the holders to convert the Series A Shares at any time after May 15, 2013 when the closing price of our Common Stock exceeds 125% of the conversion price for a specified period. In accordance with certain adjustment provisions of the investment agreement with J.C. Flowers, which were triggered as a result of our issuance and sale of our 9.75% Non-Cumulative Convertible Preferred Stock, Series B and certain 9.00% Convertible Senior Notes on June 25, 2008, we reduced the purchase price paid by J.C. Flowers by

14

Table of Contents

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

approximately $36.3 million and reset the annual dividend rate on the Series A Shares from 6.00% to 10.725%. The dividend rate of the Series A Shares will remain at 10.725% until J.C. Flowers sells those Series A Shares. We also reduced the purchase price by an additional $4.5 million in respect of J.C. Flowers' commitment to purchase more Series A Shares than we sold to it, and we reimbursed J.C. Flowers for certain transaction-related expenses.

In connection with the investment, J.C. Flowers was granted the right to appoint one director to our Board of Directors. Pursuant to this right, on July 29, 2008, Mr. David I. Schamis was appointed to our Board of Directors. In addition, if we fail to pay dividends on the Series A Shares for six quarterly periods, whether or not consecutive, the holders of the Series A Shares will have the right as a class to elect two additional directors to our Board of Directors. The terms of the J.C. Flowers transaction are described in our Current Reports on Form 8-K filed with the SEC on May 23, 2008 and July 18, 2008, which we incorporate herein by reference (except for any portion of such reports which are furnished rather than filed).

Upon consummation of the J.C. Flowers investment on July 18, 2008, we entered into an agreement to grant J.C. Flowers registration rights with respect to the Series A Shares and the Common Stock into which the Series A Shares may be converted. Under the registration rights agreement, we must, subject to certain exceptions, upon J.C. Flowers' request, file registration statements to cover the resale of the Series A Shares or our Common Stock into which the Series A Shares may be converted at the request of J.C. Flowers. The registration rights agreement also entitles J.C. Flowers to register their Series A Shares or our Common Stock into which the Series A Shares may be converted if we file registration statements to register Common Stock or any other securities, either on our own accord or at the request of another shareholder.

On February 3, 2010, we entered into a Transfer Agreement with J.C. Flowers II L.P. ("JCF Fund II"), whereby JCF Fund II and certain controlled affiliates transferred their ownership interest in the Series A Shares to JCF MFG Holdco LLC ("JCF LLC"), another controlled affiliate, and JCF LLC agreed to be bound by certain terms and conditions of the investment agreement. For this purpose, the term "controlled affiliate" means a controlled affiliate of J.C. Flowers, of which JCF Fund II is a controlled affiliate.

One of our directors, Mr. Schamis, is employed as a managing director by J.C. Flowers, which acts as an investment advisor to a number of limited partnerships that hold the Series A Shares. In addition, Mr. Schamis owns indirect minority interests in the JCF Funds.

Our Chairman of the Board and Chief Executive Officer, Mr. Corzine, also serves as an operating partner of J.C. Flowers. Pursuant to his contract with J.C. Flowers, Mr. Corzine will not receive any salary or benefits from J.C. Flowers, but, if he ceases to serve as an officer of the Company, he and J.C. Flowers will discuss in good faith his expected time commitment with J.C. Flowers and any related annual salary and benefits. Mr. Corzine has a financial interest as a limited partner in certain of J.C. Flowers' investment management entities (none of which presently are investors in our Company). Mr. Corzine's employment agreement with us contains a provision regarding corporate opportunities. In general, this provision provides that, if Mr. Corzine acquires knowledge from J.C. Flowers (and not the Company) of a potential transaction or other business opportunity that may be a business opportunity for the Company, he will have no duty to communicate or present such opportunity to the Company, will not be liable to the Company or, to the maximum extent permitted under Delaware law, its shareholders for failing to do so and will otherwise be deemed to have fulfilled his duties to the Company and its shareholders with regard to such opportunity. Mr. Corzine's employment agreement further provides that a corporate opportunity offered to Mr. Corzine will belong to the Company unless it is offered to him or he otherwise acquires knowledge of it through his capacity as an operating partner of J.C. Flowers and not through the Company or his capacity as an officer or director of the Company. His employment agreement confirms that, except as permitted in the corporate opportunities provision, Mr. Corzine remains subject to any duties (including fiduciary duties and duties of confidentiality) he may owe to the Company by reason of his service as an officer or director of the Company.

## Transaction with S3 Partners, LLC

In June 2009, in accordance with our Related-Party Transactions Policy, the Nominating and Corporate Governance Committee and the Board of Directors considered and approved a proposed related-party transaction between one of our subsidiaries and S3, a company in which one of our directors, Mr. Robert Sloan, has a majority interest. Mr. Sloan, as a then-member of the Nominating and Corporate Governance Committee, abstained from voting on the approval of the proposed related-party transaction.

Pursuant to a two-year agreement, dated as of August 21, 2009, we and S3 agreed to outsource a portion of our stock lending business in the United States to a group of employees of S3 (including Mr. Sloan). S3 employees registered with us and S3's office was designated a branch office of MF Global. In fiscal 2011, in accordance with the agreement, we paid a total of $1,000,000 to S3 and to the S3 employees (representing non-reimbursable draws and expenses), of which approximately $240,000 was paid directly to Mr. Sloan. The Company and S3 have agreed to end the arrangement effective August 2011. In connection with the ending of the arrangement, the Company may owe S3 certain monies; however, at this time, such amount is not known, as it requires a performance look-back from August 31, 2011, although we do not believe this amount to be material.

15